IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| TERRY MCKENZIE, JR. | ) | |
| | ) | |
| VS. | ) | CIVIL ACTION NO. |
| | ) | 1:25-cv-00572 |
| HELENA LABORATORIES | ) | |
| CORPORATION | ) | |

ORAL DEPOSITION OF TERRY MCKENZIE, JR.
SEPTEMBER 16, 2026

ORAL DEPOSITION OF TERRY MCKENZIE, JR., produced as a witness at the instance of the Defendant and duly sworn, was taken in the above styled and numbered cause on Wednesday, September 16, 2026, from 1:00 p.m. to 4:08 p.m., before Janalyn Elkins, CSR, in and for the State of Texas, reported by computerized stenotype machine, via Zoom, pursuant to the Federal Rules of Civil Procedure and any provisions stated on the record herein.

Job No. CS8435252

FOR READING AND SIGNING

A P P E A R A N C E S

FOR THE PLAINTIFF:

EMANUEL KATAEV
CONSUMER ATTORNEYS, PLLC
68-29 Main Street
Flushing, New York 11367
Tel: (866) 843-1869
ekataev@consumerattorneys.com

FOR THE DEFENDANT:

SONIA B. ALFARO
MEADERS & ALFARO
1330 Post Oak Boulevard, Suite 801
Houston, Texas 77056
Tel: (713) 403-3125 Fax: (855) 602-8224
salfaro@meaderslaw.com

FOR READING AND SIGNING

# I N D E X

PAGE

Appearances ................................ 2

Stipulations ............................... 4

TERRY MCKENZIE, JR.

Examination by Ms. Alfaro .................. 4

Signature and Changes....................... 96

Reporter's Certificate...................... 98

FOR READING AND SIGNING

THE REPORTER: Emanuel, do you want a copy of the deposition?

MR. KATAEV: I am just going to request a read and sign under Rule 30(e)(2).

TERRY MCKENZIE,

having been duly sworn, testified as follows:

EXAMINATION

Q. (BY MS. ALFARO) Good afternoon, everybody. My name is Sonia Alfaro. I represent the Defendant Helena Laboratories Corporation in this matter of Terry McKenzie versus Helena Laboratories presented in the United States District Court for the Eastern District of Texas in Beaumont Division. Can everybody just please state their names for the record?

THE WITNESS: Terry McKenzie, Junior.

MR. KATAEV: And Emanuel Kataev of Sage Legal, LLC for Plaintiffs.

MS. ALFARO: Thank you.

Q. (BY MS. ALFARO) Good afternoon, everybody. And good afternoon to you, Mr. McKenzie. How are you?

A. I'm doing well.

Q. Can you hear me okay?

A. Yes.

Q. Okay, perfect. So as I stated before, I'm the legal counsel for the Defendant in this matter that

FOR READING AND SIGNING

you've brought a -- a complaint against, and I will be asking you today a series of questions pursuant to the allegations you've brought against the company.

Before we begin, just a couple of ground rules and -- and instructions. Let me begin by asking you, have you ever participated in a deposition before?

A. No.

Q. Okay. So what is going to happen today in the big scheme of things is I'm going to be asking you a series of questions pursuant to, as I said, the allegations you've brought against the company, and you're going to have to respond to those.

As you saw earlier, there is a court reporter, and they are transcribing everything we say. So it's best for both you and I if we don't speak over each other. So I'm going to request that you allow me to finish up my question and once I finish, I'll allow you the same courtesy and you can respond to -- to the question.

If at any point in time, since this is virtual and sometimes there are glitches, if you're not hearing my question, if I freeze up on your end, please let us know, because sometimes, that is not visible to me and I can't know whether you heard a question or the like. Also, if you don't understand any of the

FOR READING AND SIGNING

questions, I would request that you please let me know and I will do my best to explain the question and I'll rephrase the question for you.

Throughout the course of the deposition, it is very normal that I start asking questions, the Plaintiffs start responding, and at a certain point in time, you might start nodding your head. It's part of our -- our usual way of conversing, right? So if you do that, I'm going to do this sign, just so that you know you need to verbalize your response, because again, we have a court reporter transcribing and we need to have the words as -- as -- as best as we can with regards to what we're responding.

Up to there, do you have any questions?

A. No.

Q. Okay. As you know, they took your oath this morning, so I need for you to respond in a truthful manner to -- to all the questions that we pose. During today or any time close to today, have you taken any medication that you think that would not allow you to understand any of the questions that are going to be posed here today?

A. No.

Q. Okay. Okay. For -- for the record, can you give me your full name, please?

FOR READING AND SIGNING

A. Terry Lynn McKenzie, Junior.
Q. Do you have any nicknames?
A. No.
Q. Do you go by any other names?
A. No.
Q. Where do you currently live?
A. I live at 4741 Lakeshore Drive, Port Arthur, Texas 77642.
Q. Since when have you lived there?
A. Off and on, years. I -- I can't really recall.
Q. Okay. Do you live by yourself or with somebody else?
A. With my father.
Q. What is your father's name?
A. Terry Lynn McKenzie, Senior.
Q. What is your date of birth?
A. April 30th, 1978.
Q. What is your marital status?
A. Divorced.
Q. Okay. And when were you married?
A. 20 years ago. I can't remember exact.
Q. Okay. Do you recall give or take what year you divorced?
A. 2010-ish.
Q. Okay. And you were married to who?

FOR READING AND SIGNING

A. Patricia Bailey.
Q. You were legally married and legally divorced?
A. Yes.
Q. Okay. Any other marriages?
A. No.
Q. Do you have any kids?
A. Yes.
Q. How many kids?
A. Three.
Q. Are there -- are they minors or not?
A. Two minors.
Q. Okay. And those minors are your dependents?
A. Yes.
Q. What are their names?
A. All the kids?
Q. Yes, please.
A. Joshua, Johanna, and Taylor Thomas.
Q. How old is Taylor?
A. 15. I'm -- wait. No, 16.
Q. Taylor -- is it Taylor Thomas McKenzie?
A. No, just Taylor Thomas.
Q. Okay. And Johanna, what at is Joanna's last name?
A. McKenzie.
Q. Okay. And how old is Johanna?

FOR READING AND SIGNING

A. 23.
Q. Okay. And how old is Joshua?
A. 25.
Q. Okay. And it's Joshua McKenzie?
A. Yes.
Q. Any other dependents that you might have other than these two minors?
A. Yes. Julian Merritte.
Q. Can you spell his first name for me, please?
A. J-U-L-I-A-N.
Q. Okay. Julian Merritte, you said?
A. Yes, M-E-R-R-I-T-T-E.
Q. Okay. And how are you related to Julian?
A. That is my son.
Q. Okay. Do you have four -- four children?
A. Three -- well, yes. Yes.
Q. Okay. And why -- initially I asked you, and you said you had three and then there's one. What is the -- the categorization?
A. Julian, we haven't had a -- a blood test.
Q. Okay. But he -- he is your dependent?
A. Yes.
Q. Okay. Any other children?
A. No.
Q. I'm going to ask you now a series of questions

FOR READING AND SIGNING

about your preparation for this deposition. However, I do want to be clear on the topic. I don't want you to tell me anything you discussed with your counsel. Okay? So other than telling me that you met with him or something like that, that's fine. But you cannot -- I don't want you to tell me anything about your discussions with your counsel. Understood?

A. Understood.

Q. Okay. So did you prepare for this deposition today?

A. Yes.

Q. How did you prepare for this deposition?

A. Spoke with counsel.

Q. Did you review any documentation in preparation for this deposition?

A. Yes.

Q. What documents did you review?

A. I'm not sure of the -- the names of them.

Q. Okay. Are you -- do you recall any of the documents or the names of the documents you reviewed, any of them?

A. No, I don't -- I don't know the names of any of them.

Q. Okay. Did you review one, two, three, do you recall how many?

FOR READING AND SIGNING

A. Six attachments.
Q. Okay. Besides reviewing these documents and speaking to your counsel, did you do anything else to prepare for this deposition?
A. No.
Q. Did you speak with anybody else besides your counsel about this deposition?
A. No.
Q. With regards to your employment at Helena and everything that went on there pursuant to your allegations, do you keep any journals, notebooks, any documentation of the like?
A. No.
Q. Are you currently in contact with any company employee from Helena Laboratories?
A. Yes.
Q. Okay. Who -- who are you currently in contact with?
A. Brittney Crosson. It -- it's -- it's a lot of people that I just speak to in passing. I'm -- I'm not on bad terms with really anyone. So it's -- a lot -- a lot of -- the contact is through Facebook.
Q. (BY MS. ALFARO) Okay. And do you recall the names of these people?
A. The only one I could think of off the top of my

FOR READING AND SIGNING

head is Brittney.
Q. Okay.
A. That -- that I can recall the name of.
Q. Let's do something. If, during the course of this deposition, you remember the name of somebody else you -- you communicate with via Facebook, can you let me know, please?
A. Yes.
Q. Okay. And by the way, during the course of this deposition, the Defendant's name is Helena Laboratories Corporation, but if we mention Helena or if we mention Helena Laboratories, can we understand that we're talking about your ex-employer or former employer?
A. Yes.
Q. Okay. With Brittney, do you keep in contact with her via text message?
A. Facebook. That's -- that's how I keep in contact with all of them.
Q. Understood. Mr. McKenzie, are you currently working?
A. No.
Q. When was the last time you worked?
A. At Helena.
Q. Okay. We'll go back to that again in a minute.
What is the highest degree of education

FOR READING AND SIGNING

you've obtained?
A. Associate's.
Q. Where?
A. Lamar State College, Port Arthur.
Q. And it was an Associate's degree in what?
A. Business administration.
Q. Give or take, do you recall when that was?
A. 2006, I believe.
Q. Any other schools or licensing, training, certification that you might know?
A. I have expired forklift license, different -- different licenses and certificate to get in the plant that are all expired.
Q. Okay. Besides this lawsuit that has been filed by you against Helena, have you filed any other lawsuits before?
A. Oh, my -- I've got in a wreck before.
Q. Okay. And when you got in a wreck, did you file a lawsuit against somebody?
A. I -- I don't know if that was called filing a lawsuit. I had to get a lawyer to get compensated.
Q. Okay.
A. So if that -- if that's a lawsuit, then that's what I --
Q. See, let's call it -- we don't know if it's a

FOR READING AND SIGNING

lawsuit or a claim. But you made a claim against the person you got into a wreck with and from there, you got money?
A. Yes.
Q. Do you recall how much money you got?
A. No, I don't.
Q. When was this?
A. I actually don't recall.
Q. Would it have been in the last ten years, maybe?
A. Yes.
Q. Other than the -- let's call it claim or lawsuit, you don't know, that you -- that somebody filed on your behalf for this wreck, do you recall any other claim or lawsuit that you started or filed?
A. I've never -- nothing else.
Q. Do you recall prior to filing a lawsuit in court in this case and the case against Helena, you filed a charge of discrimination at the EEOC. You're aware of that, right?
A. Yes.
Q. Okay. Besides that charge of discrimination against Helena EEOC, have you filed any other charge of discrimination against anybody else at the EEOC or TWC?
A. Not that I'm aware of, no.

FOR READING AND SIGNING

Q. Now, I'm going to ask you a question that sounds similar but isn't. Has anybody else filed a lawsuit against you?

A. No, not that I'm aware of.

Q. Have you ever been -- have you ever been charged or convicted criminally?

A. Yes.

Q. Okay. Can you explain?

A. It was -- it was in the past. I can't really remember the exact details.

Q. Were you arrested?

A. Yes. And was placed on probation.

Q. Where was this?

A. I was on probation out of -- out of Port Arthur, Texas.

Q. Do you remember when was this, give or take?

A. Maybe -- where the charge was or when -- when the probations were?

Q. Well, let's -- let's do it both ways. Do you recall when the charge was, give or take?

A. I -- I have more than one charge, and I -- but I was on -- placed on probation -- I was placed on probation twice. And the last time was in 2020.

Q. Do you know what you were -- you were charged with on any of those occasions?

FOR READING AND SIGNING

A. DWI, that's the -- that's the only one that I remember the charge.
Q. And for this charge, were you ever arrested, did you ever spend time in jail?
A. Time enough to place bond.
Q. Okay. Okay. Besides this recollection that you have on the DWI, any other criminal charge or offense you've been charged with?
A. Like I said, I can't exactly remember. I've been charged, but I -- to the best of my knowledge, I've only been on probation twice.
Q. Okay. Would it be fair to say that you've been charged more than once and that's what your recollection is?
A. Yes.
Q. Okay. So you understand that your counsel has filed a lawsuit or complaint in federal court on your behalf, correct?
A. Yes.
Q. Have you been able to read that complaint that was filed?
MS. ALFARO: I'm sorry. Emanuel, did you say something?
MR. KATAEV: Just objection to form.
Q. (BY MS. ALFARO) Okay. Back to my question.

FOR READING AND SIGNING

Have you ever read the complaint and the lawsuit filed on your behalf in this case, in the case against Helena Laboratories?
A. Yes.
Q. Are you in agreement with what you read and understood about this lawsuit complaint?
A. To the best of my knowledge, yes.
Q. Okay. So let's talk a little bit about your employment with Helena Laboratories. Okay?
A. Okay.
Q. Do you recall, give or take, when you were hired by them?
A. I worked through a temporary agency and then got hired on.
Q. Would that be Kelly Temporary Services?
A. Yes.
Q. Do you remember the position that you were hired by Kelly to work for Helena in?
A. Production.
Q. And when you say that the position is production, what -- what does a person in production at Helena do?
A. Different things. Tris-buffered saline, just different things. Sometimes -- box stuff up. But I -- I haven't been there in a while, so I don't know the

FOR READING AND SIGNING

exact terms. But putting things through glass bottles in a thing and -- and coat them so they won't retain water and stuff like that.

Q. And then you were telling me that you went to work for this company through a temporary agency. But if I understood correctly, then they hired you on as their employee?

A. Yes.

Q. Okay. And do you recall when you were hired by Kelly Temporary Services to work at Helena, what year?

A. January, 2023 or 2024. January, either 2023 or 2024. I -- I can't remember.

Q. Okay. And do you recall give or take how many months passed since the time you were brought in by the temporary agency to work for Helena until they hired you as an employee?

A. Nine months, I believe.

Q. And when you were hired in as an employee of Helena, was your position still production?

A. Yes. Nothing changed. I just...

Q. You went from temporary worker through an agency to an employee of the company?

A. Yes.

Q. Okay. Who was your supervisor at Helena?

A. Vickie Locke.

FOR READING AND SIGNING

Q. Do you know Vickie's position?
A. I don't know the exact term for it.
Q. Anybody else serve as your supervisor while you worked there?
A. I believe a lady named -- I don't remember her name.
Q. Okay. You were going to say a lady you believe whose name is something. What was that?
A. Patty.
Q. Okay. And you -- you don't know if her name is Patty or you don't know her last name?
A. I don't know if her name was Patty. I -- I don't remember.
Q. Is it your recollection that somebody else besides Ms. Vickie supervised you at the company?
A. It's my recollection that someone was below Ms. Vickie.
Q. Okay. In -- as part of your job, did you interact with that person, did that person give you instruction, handled anything regarding your employment?
A. Not -- not to my knowledge.
Q. Okay. So from the time you started working as a Helena Laboratories employee to the time you stopped working at Helena Laboratories, how much time passed? Do you know?

FOR READING AND SIGNING

A. How long did I work there?
Q. Yes, sir.
A. Two years.
Q. And when you say two years, are you counting the time you were working for Helena under Kelly Temporary Services?
A. Yes. Two years and some months. Let me be more specific.
Q. So pursuant to the complaint that your attorney has filed on your behalf in court, you had a medical situation while working at Helena, correct?
A. Yes.
MR. KATAEV: Objection to form.
Q. (BY MS. ALFARO) Okay. So can you explain to me what situation you had?
MR. KATAEV: Objection to form.
THE WITNESS: A brain tumor.
Q. (BY MS. ALFARO) Go ahead, Mr. McKenzie.
A. A brain tumor.
Q. Okay. Who diagnosed you or told you that you had a brain tumor?
A. Emergency room staff.
Q. Do you recall when this happened?
A. January 3rd.
Q. Of what year?

FOR READING AND SIGNING

A. 2025, I believe.

Q. Okay. Let me ask you this. If the petition the -- or the complaint that was filed on your behalf in court says that this happened on January 3rd, 2024, do you think that would be correct?

A. Yes, if that's what it says.

Q. So can we state fairly that -- we'll talk about this diagnosis in the emergency room of a brain tumor, that would have been January 3rd, 2024 pursuant to what --

A. Yes.

Q. Okay. Okay. So on January 3rd, 2024, why did you go to the emergency room?

A. I had a headache. I had a funny feeling headache.

Q. That -- you said funny feeling headache?

A. Yes, not just a normal one.

Q. Okay. And where were you when you started feeling this headache?

A. I was in -- I was at my station in -- I can't remember the name of it. I -- I can't remember the name of the station. But I was -- I was at my workstation, work area, workstation.

Q. So you were at Helena Laboratories?

A. Yes.

FOR READING AND SIGNING

Q. Okay. And walk me through this. What -- what happened in -- while you were there?
A. I told different people. Someone came with a blood pressure cuff. My blood pressure was extremely high. So I went to the emergency room. I was told to go to the emergency room, you know, and I went.
Q. Let's break this down a little. So you told me you told different people -- can I -- can I correctly assume you were telling different people you were not feeling okay?
A. Yes. I -- I was asking for Tylenol or something.
Q. Okay. Do you recall the names of any of these people you told this to?
A. Different people. Erica Ray, Vickie, more -- more people than that. But I -- I can't remember the names.
Q. Okay. That's fair. So the names that you do recall telling this to were Erica Ray and Vickie Locke?
A. Yes.
Q. Okay. Let's talk a little bit about that. Do -- you would -- told me you were in your work area. My question to you is does Vickie Locke, does she regularly work in your work area?
A. No.

FOR READING AND SIGNING

Q. Where does -- or where did Vickie Locke regularly work at?
A. She -- she works from place to place supervising.
Q. Okay. So let me ask you this. Did you have to walk somewhere that day to tell Ms. Locke that you had this headache or needed Tylenol?
A. I walked somewhere to tell everybody.
Q. Do you know what Ms. Erica Ray's position at the company is or was?
A. Shift coordinator? I'm not sure.
Q. Okay. You also walked -- strike that.
Does Ms. Erica Ray work in your same work area or worked?
A. Next door.
Q. Would it -- would it be fair to say that you walked over to her to let her know?
A. To let her know and ask for Tylenol.
Q. Do you recall if you went first to Erica and then to Vickie or to Vickie and then Erica?
A. They might have been in the same room. Their offices are in the -- basically in the same room.
Q. Okay. So let's take it one by one. When you told Erica that you needed Tylenol or had this headache, what was her response?

FOR READING AND SIGNING

A. I can't recall.
Q. Do you recall Ms. Vickie's response?
A. I can't recall. I -- I can't -- I can't recall.
Q. You also mentioned that somebody took your blood pressure, correct?
A. Yes.
Q. Do you know who took your blood pressure?
A. I can't recall.
Q. Do you recall who told you to go to the hospital?
A. I can't recall.
Q. Okay. How did you get to the hospital?
A. I drove.
Q. Okay. And you drove to the emergency room?
A. Yes.
Q. Okay. Now, walk me through a bit of what happened at the emergency room. You get to the -- you drove yourself to the ER. What happens?
A. I told them I had a headache and my blood pressure was high.
Q. What happened next?
A. They eventually took a scan of my head.
Q. That same day?
A. Immediately.

FOR READING AND SIGNING

Q. Okay. And once they took the scan of your head, what happened next?
A. I was sitting in my -- my ER room and -- just waiting, and some -- a nurse came in and told me that I had a brain tumor.
Q. So once they tell you this, did they told you -- tell you you had to be admitted? Did they let you go? What happened next?
A. No. They told me I was -- they was going to transfer me to Houston.
Q. Did they transfer you to Houston?
A. Yes.
Q. That same day?
A. Yes.
Q. Okay. So what happened in Houston?
A. The -- I met with Dr. Blackburn. Dr. Blackburn told me about how the surgery was going to go. Normal emergency room stuff like that.
Q. Okay. So let me understand something here. So they transferred you in an ambulance?
A. Yes.
Q. Okay. And you said that transfer happened the same day. So we're still in January 3rd, 2024?
A. Yes.
Q. Okay. Once they transfer you to Houston, are

FOR READING AND SIGNING

you admitted to the hospital?
A. I went home the next day.
Q. So would it be fair to say that on January 4th, 2024, which would be the next day, they released you, the hospital released you?
A. I wanted to be released, yes.
Q. Okay. When you say "I wanted to be released", what does that mean?
A. I didn't have insurance, so I wanted to get insurance to get brain surgery.
Q. Okay. So did you have to sign documents allowing them to leave the hospital?
A. I don't recall.
Q. Or did a doctor say, okay, I'm going to let you leave the hospital now, and then released you?
A. I -- I don't recall.
Q. Okay. So you're in Houston on January 4th, 2024, and you're released -- you're leaving the hospital, at least. You don't know if you were released or not. But you're leaving the hospital in Houston. What happened next? Where did you go?
A. Home.
Q. How did you get home?
A. My dad picked me up.
Q. Okay. And what -- what happened next?

FOR READING AND SIGNING

A. I believe -- I mean, what do you mean?

Q. Well, it's January 4th, and you've returned back to your home from Houston. I want to understand what happened next. Are you at home? Are you visiting doctors? Do you go back to work? What happens next?

A. I -- I had doctor's visits and things like that. I went up to work a -- a few times to see everybody and, you know, check on things.

Q. Okay. Well, let's talk about that -- this so I can get this clear. After January 4th, 2024, January 5, 6, 7, any time in January 2024, did you return to Helena to work?

A. No, I -- I didn't -- I didn't return to work.

Q. Okay. So after you returned from the Houston hospital to your home, did you send any paper -- any medical paperwork to Helena?

A. No, I wasn't asked for any.

Q. After you returned from Houston hospital to your home, did you call your supervisor to let them know what was going on with you?

A. I called my supervisor in the ambulance.

Q. Okay. And when we talk about your supervisor, this would be Vickie Locke?

A. No. I never called Vickie. I talked to Vickie when I went up there. I called Erica Ray in the

FOR READING AND SIGNING

ambulance.
Q. Okay. Well, let's take this one by one. When you called Erica Ray in the ambulance, this is on January 3rd, 2024, what did you tell her?
A. I had a brain tumor.
Q. What did she respond?
A. Something like in amazement. I can't remember the exact words. But shocked.
Q. And --
A. Can I say this?
Q. Yeah, sure.
A. I hadn't been able to taste or smell for -- for, like, six months. So that was why -- why -- it was, like, a big thing around there that I couldn't taste or smell, and we were all trying to figure out why and different things. So that's why I called Erica. And I -- I know that Erica reports to Vickie.
Q. You told me earlier Erica was the shift coordinator. So I want to make -- I want to ask you something. Was Erica your supervisor?
A. No, she was the shift coordinator.
Q. Okay.
A. Well, she -- she's under Vickie. So she was between me and Vickie. And that might not be the term, shift coordinator might not be her typical term. I

FOR READING AND SIGNING

don't want to get caught up in that.

Q. No, that's fine. I understand you told me that you thought it was -- her position was shift coordinator, but you don't know.

A. Yeah.

Q. Okay. So did you communicate that day, January 3rd, 2024 with anybody from the company besides Erica?

A. No.

Q. Okay. Let me ask you this; when you worked for Helena, were your shifts typically Monday through -- through Friday?

A. Monday through Thursday. No, Monday through Friday, yes. I -- I can't remember if it was Monday through Thursday or Monday through Friday.

Q. Okay. And you worked, what, 8:00 to 5:00?

A. 7:00.

Q. 7:00?

A. To 5:00.

Q. To 5:00. While working for Helena, right, at any point in time, if you were going to be absent or going to be late, what was the process for you to notify that?

A. I would call. I -- I would call.

Q. You would call who?

FOR READING AND SIGNING

A. I would call -- I -- I -- I can't remember because it -- it happened so very little time. I can't remember.

Q. When you say it happened so very little time, what happened in a very little time?

A. Being late or absent.

Q. Okay. But you do recall that the way to inform that would have been a call?

A. Yes.

Q. Okay. Now, let's go back to January 4th, 2024, okay, the day after you returned from the hospital. Do you recall after your return from the hospital when you made -- when you went to work a few times?

A. Yes. I don't -- I don't recall the days, though. I don't recall the exact days.

Q. So let's limit this a little. Do you know if it was in January 2024?

A. It was in January.

Q. Okay. And when you say you went up to work, were you going -- you weren't there working. You were socializing?

A. Yes. And -- and just talking to different people. Went to HR a couple times.

Q. When you say you went to HR, is HR an office?

A. Yes. Well, it's -- it's -- it's an office, but

FOR READING AND SIGNING

it's in a separate building than where I worked.

Q. Okay. So during the month of January 2024, do you recall going once or more than once to Helena to socialize?

A. More than once. I wouldn't call it social -- well, maybe it is socializing. I wouldn't call it socializing. I was going, you know, like, check on my job and things like that.

Q. Okay. So I just want to understand. First, I want to understand when you went, and then we're going to talk about what you did there. Okay?

A. Okay.

Q. So you told me it was more than once and you don't remember the exact dates? Was it --

A. I don't.

Q. -- more than twice?

A. Yes.

Q. More than three times?

A. Yes.

Q. More than four times?

A. I'm not -- I'm not sure.

Q. Okay. So you are sure that at least on three occasions, you visited the facilities?

A. Yes.

Q. And this was in January 2024?

FOR READING AND SIGNING

A. Yes.
Q. Okay.
A. I visited other times after January as well.
Q. Okay. And do you recall what months you visited there?
A. February, again the beginning of May. And -- and then later on in June or July when I was -- I had an interview there.
Q. Okay. Okay. So let's take this one by one at least by months. January 2024, you recall after your hospital visit, you recall visiting Helena, you've told me, you testified at least three times, correct?
A. Yes.
Q. Okay. The first time, who did you talk to?
A. Vickie, Janice. I talked to everybody.
Q. Well, when you say "everybody", who is everybody?
A. The -- like, my friends, super -- supervisors in different departments.
Q. Okay. So tell me the names of the people you recall talking to on that first visit in January 2024?
A. The -- that I can recall, Erica, Vickie, Janice. I -- I don't really recall the names -- I can look on Facebook and tell you their names, but I don't -- like, right now I'm drawing a blank. Bert -- I

FOR READING AND SIGNING

talked to Bert, Ms. Bert.

Q. Anybody else you recall having talked to that first visit?

A. Ashley. Just a lot of people.

Q. Okay. The -- the ones you can recall the names as of right now are Vickie, Janice, Erica, Ms. Bert, and Ashley?

A. Yes, that's the ones that I can recall their names.

Q. So do you recall your conversation with Vickie?

A. Just talking about I -- I had to have brain surgery. And that's what was the cause of me not being able not to taste or smell. That was the conversation with everybody.

Q. Okay. So let's start with Vickie. You told Vickie, you -- you've testified you told Vickie you had brain surgery and that that was the cause of not being able to taste or smell. What was the --

A. No, I -- I'm -- I testified that I was going to have to have brain surgery because I had a tumor. I'm sorry. I didn't put that in there. But I -- you know.

Q. Okay. Understood.

A. And that was the cause of my not being able to taste or smell for so long.

Q. And when you told Vickie this, what was her

FOR READING AND SIGNING

response?

A. Oh, wow, you know. It was -- I mean...

Q. Anything else you recall she responded to you?

A. No, just normal conversation.

Q. When you say "normal conversation", what does that mean?

A. What -- what most people would say when someone tells them you have a brain tumor, that -- that they have a brain tumor and they have to have brain surgery.

Q. Okay. But I -- I don't -- I need you to explain to me what you understand to be that normal conversation, because I don't know. And let me take -- let me present this another way.

I need you to tell me to the best of your recollection what Vickie told you when you told her this information.

A. I can't remember anything specifically.

Q. So one thing or another, you can't remember what her response was?

A. I can't -- I can't remember specifically. It was just related to the tumor and surgery.

Q. Okay. You told me you can't remember specifically what she told you. Can you remember broadly what she told you?

A. Broadly is -- is related to the tumor and

FOR READING AND SIGNING

surgery. That's...
Q. So she talked to you about the tumor and the surgery?
A. Yes.
Q. That day -- day that you're talking with Ms. Vickie, did you take any medical paperwork in to her?
A. No.
Q. Do you recall if she requested from you medical paperwork?
A. No, because if she would have requested it, I would have gave it to her.
Q. Well, I --
A. I didn't have any on hand to give. I -- I would have went and requested it from the doctors, from the neurosurgeons.
MS. ALFARO: Objection, nonresponsive.
Q. (BY MS. ALFARO) My question was if you recall her asking you for paperwork.
A. No, I don't recall her asking me for paperwork.
Q. Just like you don't recall exactly what y'all talked about except for talking about brain tumor and surgery?
A. Yes.
Q. Let me ask you this; when you left the hospital

FOR READING AND SIGNING

in Houston, did they -- did the doctor tell you you had any restrictions whatsoever?

A. I can't recall. As -- yeah, I can't recall.

Q. When you left the hospital in Houston, do you recall if they gave you any papers?

A. They gave me -- they gave me typical discharge papers.

Q. When you left the hospital in Houston, did the doctors give you any instructions as to what your next steps medically you had to take?

A. I knew -- I was told I had to have brain surgery.

Q. Besides telling you that, did they tell you to make any appointments, tell you to visit any doctors?

A. Yes, my neurosurgeon.

Q. Do you recall when that first visit with the neurosurgeon would have been?

A. I don't recall.

Q. Do you recall if it was in January 2024?

A. Yes.

Q. So when -- when you leave the hospital in Houston, you've been told you have a brain tumor, pursuant to your testimony. You've been told you need brain surgery. But you don't know when this will happen, right?

FOR READING AND SIGNING

A. Right.
Q. Okay. So now I'm going to go back to that first visit you were telling me about to Helena after your diagnosis. You told me you talked to Vickie and we talked about that. You told me also that you recall talking to Janice, right?
A. Right.
Q. And do you know what Janice's position in the company is?
A. Human resources.
Q. Okay. And do you recall what you told Janice?
A. Yes, I told her -- yes, that I -- I had a brain tumor and had to have brain surgery.
Q. What did she say?
A. She was concerned.
Q. Did she respond to anything else that you recall?
A. No, she was just very concerned.
Q. And other than her being very concerned, do you know if she told you anything else or you just don't recall if she did or not?
A. No, I -- I know it was --
MR. KATAEV: Objection to the form.
Q. (BY MS. ALFARO) Go ahead.
A. To the best of my knowledge, that's all we

FOR READING AND SIGNING

talked about. She was just concerned, she was very concerned. That -- that's -- that I remember.

Q. Okay. You also mentioned that on that first visit, you also talked to Erica, right?

A. Yes.

Q. Okay. And what did you tell Erica?

A. The same thing.

Q. What is that?

A. I had a brain tumor, that's why I couldn't smell or taste. And I had to have brain surgery.

Q. What was her response?

A. Another -- well, shocked.

Q. Do you recall anything else other than her being shocked?

A. No.

Q. Now, how long do you think you talked to Erica?

A. I -- I talked to her for a while. I can't remember how long. But it -- it was -- I probably talked to her more than I talked to --

Q. More than --

A. -- I probably talked to her more than I talked to Janice and -- and Vickie or Bert.

Q. And from that conversation, all you can remember is that she was shocked?

A. Yes. And I believe it was -- it was her who

FOR READING AND SIGNING

told me about vacation time and stuff that I had.
Q. Okay. What do you recall her telling you about vacation time?
A. That I had some. I had just came off vacation.
Q. Okay. When you say you came off vacation, that means that prior to January 3rd, you were on vacation?
A. Yes. January 3rd was my first day back.
Q. All right. So how long had you had vacation prior to January 3rd?
A. Let me -- let me rephrase. Paid time off.
Q. Okay. So using the term "paid time off", how long did you leave on paid time off before returning on January 3rd, 2024 to work?
A. I can't recall the exact amount of time.
Q. Well, I understand you can't recall the exact amount of time. Was it for a week, more than a week?
A. More than a week.
Q. Okay. And I know we understand it's more than a week. Was it for two weeks?
A. Probably a little more. I'm not sure.
Q. Do you recall how much vacation time you that you went for, which I think is PTO based on what you told me, Erica told you that you had when you spoke to her after that first visit after January 4th?
A. She didn't tell me an amount that I had. She

FOR READING AND SIGNING

just told me that it renewed -- it -- it -- it started over again January 1st.

Q. And typically, how much PTO time did you get every year?

A. I can't recall.

Q. The other -- another lady you told me you talked to on this first visit was Ms. Bird, right?

A. Bert.

Q. B-I-R-T?

A. B-E-R-T.

Q. B-E-R-T. Thank you. So when you talked to Ms. Bert, what did you tell her?

A. About my -- same thing about my brain tumor and that's why I couldn't taste or smell. And I had to have brain surgery.

Q. What was her response?

A. Very concerned.

Q. What is Ms. Bert's position in the company?

A. She's over another department.

Q. Do you know what that department is?

A. I'm not sure. I can't remember the names of the other departments.

Q. Do you recall give or take how long you spoke with Ms. Bert?

A. I spoke with her and her employees maybe five

FOR READING AND SIGNING

minutes.

Q. Okay. And your -- your only recollection of those five minutes is that they were very concerned in that conversation?

A. Yes. Yes.

Q. You also told me you spoke with Ashley, correct?

A. Ashley is in Bert's department, so that was all at the same time.

Q. Okay. During this first time visiting and talking with the company, did you tell anybody that you wouldn't be able to work?

A. Yes.

Q. Who did you tell that to?

A. I told that to everyone. Everybody I talked to.

Q. Well, I just asked you what you told these people and you hadn't told me that. So tell me, what did you tell Vickie about not being able to work?

A. I can't work until I get the tumor out.

Q. That's exactly what you told her?

A. No, I don't remember the exact words.

Q. Do you have any recollection of what you told her about not being able to work?

A. It was -- I don't really recall.

FOR READING AND SIGNING

Q. Same question as to Janice. Do you recall what you told her on this topic of not being able to work?
A. I can't recall.
Q. Same question as to Erica. Do you recall what you told her about --
A. I can't recall.
Q. -- about not being able to work?
A. Right. I can't recall.
Q. Same question as to Ms. Bert.
A. I can't recall. I don't think I told -- I -- I take that back. I don't think I told Ms. Bert. Me and Ms. Bert didn't talk anything about me not being able to work or Ashley.
Q. So when you told whatever you told Vickie about not being able to work, what was her response?
A. I -- I don't recall.
Q. And when you say you don't recall, if she had a response for you, if she told you something, you wouldn't recall what she told you?
A. Say that again?
Q. I just want to be clear. When you say "I don't recall what she told me", are we clear that if she told you something, you don't recall what that response would have been?
A. I word it like -- if she gave me an

FOR READING AND SIGNING

instruction, I would have recalled what the instruction was. But it was just conversation.
Q. Okay. But again, you told me you don't recall what she responded, right?
A. Right.
Q. And you are assuming that if she would have given you an instruction, you would have remembered, right?
A. Right.
Q. Okay. Anything else regarding any -- any of these conversations you had this first time in January 4 -- after January 4, 2024 when you visited Helena that we haven't discussed?
A. No, not that -- not that I recall.
Q. Okay. So you mentioned to me that you recall in January 2024 visiting Helena at least three times. We've talked about that first visit after your hospital stay. Let's talk about the second visit. Okay?
A. Okay.
Q. When you visited Helena on the second visit, had -- had you already had your appointment with your neurosurgeon?
A. No.
Q. Do you -- do you know, give or take, how much time passed between one visit and the second visit?

FOR READING AND SIGNING

A. It wasn't much time between the visits.
Q. Okay. Do you think it was one week in between visits?
A. One week or less.
Q. Okay. And what was the purpose in you visiting Helena the second time in January 2024?
A. Really just to talk to the people.
Q. When you say "talk to the people", you mean, like, socialize with coworkers?
A. Talk -- yes, talk to my coworkers, talk to upper management, talk to HR.
Q. Just to talk?
A. Yes.
Q. Okay. The second visit in January 2024 to Helena, do you recall who you talked to?
A. I can't recall. Just people in my department and HR and that's it. Talked to Ms. Bert again, Ms. Bert and her department.
Q. Okay. This time around, do you specifically recall talking to Vickie?
A. Yes.
Q. This time around, do you specifically recall talking to Erica?
A. Yes.
Q. Okay. When you say "people in HR", do you

FOR READING AND SIGNING

specifically recall talking to anybody in HR?
A. Yes, Janice. And I think it was another lady in there.
Q. Okay. And then you said you talked to Ms. Bert and her people, right?
A. Yes.
Q. Okay. This time around, second visit, you've already told Ms. Vickie before that you were diagnosed with a brain tumor and needed surgery. At this point in time, you haven't visited your neurosurgeon. So what exactly what did you talk to Ms. Vickie about?
A. Just how things were going.
Q. What does that mean?
A. Just what's -- just what's going on. I mean, that was my -- that -- that was my supervisor, you know. So...
Q. Okay.
A. Touch bases.
Q. Do you recall what you told Ms. Vickie?
A. No, ma'am.
Q. No recollection at all?
A. No recollection. It was just -- like I said, just touching bases. That -- that -- that was my supervisor.
Q. Okay.

FOR READING AND SIGNING

A. So just keeping in contact.
Q. So you -- you recall talking to Ms. Vickie. You do -- you have no recollection as to what you spoke with her. Do you have any recollection as to what she told you?
A. No.
Q. Okay. You also mentioned recalling talking to Erica in this second visit in January 2024, correct?
A. Correct.
Q. Okay. And you -- what did you tell Erica?
A. The same -- it was pretty much the same conversation I had with Ms. Vickie.
Q. Which you don't recall what you spoke with Ms. Vickie?
A. Right.
Q. And --
A. I don't recall the exact words.
Q. And you told me that your only recollection was talking about how things were going?
A. Right.
Q. And do you recall anything Erica responded to you that day?
A. No.
Q. Let's talk about Janice and another lady in there. You don't recall that other lady's name, right?

FOR READING AND SIGNING

A. Right.
Q. Okay. What did you tell them?
A. Same -- same thing about how things was going. And I don't remember what visit it was, but one visit I -- I went -- I asked about -- asked about what -- no, specifically asked about what do I need to do about my job.
Q. Okay. I'm going to come back to that in a minute. But I want to lead with Ms. Janice. You said same, talked about how things were going. Do you recall what that means or not?
A. No, just random stuff.
Q. Do you recall any of Ms. Janice's response to you?
A. The only specific thing I recall Janice said to me was don't worry about it, get better and come back. That's -- out of everything else, all the other conversations, that -- that's the only thing that stuck out to me in all those conversations that I had with everybody. Like, I don't remember. Like, it wasn't nothing. It -- I mean, I don't recall. It wasn't nothing to, you know.
Q. And that's okay. If you don't recall, that's okay.
Then you also told me you talked to

FOR READING AND SIGNING

Ms. Bert and her people in that second visit, right?
A. Yes. Yes, ma'am.
Q. Do you recall what you told Ms. Bert and her people?
A. Same thing; just talk about how's -- how's stuff going up there and, you know, what's going on with me.
Q. Any specifics on that conversation of what you told them that you recall?
A. No, ma'am.
Q. And any recollection on -- on what Ms. Bert responded to you?
A. No. That -- that whole department is just -- I -- I can say that they were just very -- like, the conversation was different. It was more of -- of a concern type thing.
Q. And that's all you remember. No other specifics or other response, right?
A. Yes. Right.
Q. Okay. Now, going back to your -- your testimony, you said you don't recall exactly when, but Ms. Janice in one visit talked to you, I think you said about what you needed to do about your job?
A. Yes.
Q. Okay.

FOR READING AND SIGNING

A. No, I asked her.
Q. Oh, you asked her. Okay. So do you recall -- if this I understand that you can't recall if it was in the second visit or not. But do you recall you asking -- if it occurred in January 2024?
A. Honestly, no. I -- I don't recall when I asked her that. I just recall what she said.
Q. And that means this could have -- you could have asked after, any time after January 2024?
A. If -- it was in January.
Q. You specifically recall it was in January?
A. I'm -- I'm sure it was in January.
Q. Okay. And since you remember now that it was in January 2024, do you recall if it was the first visit, second one, or the third one?
A. I don't remember.
Q. Okay. What do you recall about this conversation with Ms. Janice?
A. Nothing. Just -- I thought everything was all good. I just -- I just was focused on getting better and coming back.
Q. Okay. But --
A. That's what I was told about it.
Q. You told me you asked her what you needed to do about your job, correct?

FOR READING AND SIGNING

A. Yes.
Q. Were those your words?
A. I don't remember what the words were.
Q. You don't remember exactly what you asked about your job?
A. I don't remember exactly how I worded it.
Q. Do you recall her response?
A. I recall her saying, don't worry about it, just worry about getting better and come back.
Q. Okay. So we've been discussing the second visit to -- you made to Helena Laboratories to talk to coworkers in January 2024. Anything else, anybody else you recall talking to or any other conversation you recall that we -- we have not discussed?
A. Sally is a person that I spoke with.
Q. In that second visit?
A. No, in all of them.
Q. So do you know where -- what Sally does for Helena?
A. Records or something.
Q. Okay. Let's talk about the first visit, then, you made to Helena and talked to Sally. Do you recall what you told her?
A. I had a brain tumor and had to have surgery and that's why I couldn't smell. I remember that

FOR READING AND SIGNING

conversation specifically because she brought me some cloves one time.

Q. When did she bring you clothes and for what purpose?

A. To help -- just a remedy for not being able to taste or smell, that's -- you know, brought some cloves to chew.

Q. She brought you some clothes, you mean?

A. Cloves, C-L-O-V.

Q. Oh, cloves. Gotcha. Gotcha. Okay. And that would have been before January 3rd, 2024?

A. Yes, that -- yes. The -- yes. That was well before then. But I'm just saying, I -- like, that was one of the main reasons I was talking to her about my tumor because she had tried to help me with me not being able to taste or smell.

Q. Okay. And do you recall what her response to you on the first visit was?

A. I don't recall.

Q. Okay. Do you recall what you spoke with Ms. Sally on the second visit of January 2024?

A. Same thing all three -- three -- well, except for the third visit. But the -- the first two visits was about what was going on with me and with them.

Q. Okay. And on the second visit, do you recall

FOR READING AND SIGNING

anything Ms. Sally responded to you?

A. No, I don't recall.

Q. Okay. Anything else regarding the second visit by you to Helena in January 2024 that we haven't discussed?

A. Not that I recall.

Q. Okay. You previously testified that you had a third visit to Helena that you can recall in January 2024, correct?

A. Right.

Q. Do you remember that visit?

A. That -- that visit, it probably -- if it wasn't in the same week, then it was the next week. Like, it was all close together.

Q. Do you remember if, by the time you were doing this third visit to Helena, you had already had your visit with your neurosurgeon?

A. Not by the third visit, no. I hadn't had it.

Q. Okay. Do you recall who you talked to in this third visit?

A. The same people.

Q. And when you say the same people, we're talking about Vickie, Erica, Sally, Janice, Ms. Bert?

A. Yes. Did you say Sally?

Q. Yes.

FOR READING AND SIGNING

A. Because Sally also, yes.
Q. Yes. So Vickie, Erica, Sally, Ms. Bert; those are the people you remember talking to?
A. Those are the people I remember by name. But I talked to people in -- in my department and stuff like that. But I don't know, you know.
Q. Before we start talking about what you talked to these people, let me ask you; at any point in time after January 4, 2024, did you text any of your supervisors?
A. I Facebooked Erica Ray.
Q. And when you say Facebook, did you send her a message, did you like a post, what are we talking about?
A. Message.
Q. And what did you message Erica?
A. I -- I -- I may have text her, also. I'm not sure. But I know I Facebooked. I -- I know I direct messaged her on Facebook. Now, I -- I -- could have text her as well, but I'm not sure.
Q. Okay. And this direct message on Facebook that you recall, what -- why did you send her a message, what was it about?
A. Just random -- I think I -- I really -- I -- I don't recall what those messages were about. I only recall the message. Well, that -- I don't recall what

FOR READING AND SIGNING

those messages was about in January -- before the surgery, I don't recall what those messages were about.

Q. Okay. And because you don't recall, you don't know if this was personal, if this was work-related, you don't recall?

A. Probably was more personal than work-related.

Q. But you don't recall?

A. But I don't recall.

Q. Okay. But besides these Facebook messages to Erica that you recall having sent out, did -- do you recall in January 2024 sending any texts to anybody or Facebook messages to anybody other than Erica?

A. Not that I recall. Not at Helena, at least.

Q. Okay. So let's go back to that third visit. Okay? And we're going to go through the same process. I'm going to be asking you what you recall about the conversations with the people you remember talking to.

So with Ms. Vickie, you specifically recall talking this third time with Ms. Vickie?

A. Yes.

Q. Okay. And what was your conversation to her?

A. That was just hi and bye, more -- more -- you know.

Q. That was just more what, I'm sorry?

A. Hi and bye. Like, not a conversation or

FOR READING AND SIGNING

anything.

Q. Okay. How about with Erica on that third visit? What do you recall about that conversation?

A. Just personal stuff about what's going on around there at -- at work.

Q. When you say "personal stuff", does that mean personal stuff about you or personal stuff about her or other people at work?

A. Personal stuff about people at work.

Q. Would it be fair to say, then, that this time around, this third time or visit in January 2024 to Helena, you were not talking to Erica about you?

A. I maybe, you know, she maybe asked how I was doing or something like that. But that wasn't --

Q. Do you recall or -- or not?

A. I don't recall.

Q. Okay. You also told me you recall talking to Sally. Do you know -- do you remember what you talked with Sally about?

A. No, I don't recall.

Q. How about with Ms. Bert, do you recall anything about that third time conversation?

A. No, I don't.

Q. In any of these three visits to Helena during January 2024, do you recall anybody telling you to go

FOR READING AND SIGNING

pick up FMLA paperwork?
A. No, that -- I don't recall that. Nobody didn't tell me that.
Q. Okay. Do you know what FMLA is?
A. I've since learned. I know now. I didn't know then.
Q. During any of your three visits to Helena, did you ever ask what paperwork you needed to fill out since you were not going to work?
A. That's basically what I asked Janice. That's -- when I say that -- what do I -- what do I do about my job, that's what -- that's what my understanding of what, you know, that was. That -- that -- that's what that question was. I didn't say specific what papers do I need? I don't -- I don't think I said that. But I just needed to know what do I do about my job?
Q. When you left the hospital in Houston in January 3rd, 2024, did the doctors tell you you could not work?
A. They told me -- no, they did not tell me that, no.
Q. So would it be fair to say that when you did not return to work after January 3rd, 2024, you decided not to return to work?

FOR READING AND SIGNING

A. Till after my surgery.
MR. KATAEV: Objection, argumentative -- objection, argumentative.
Q. (BY MS. ALFARO) You decided not to -- per your testimony, you decided not to return to work until after your surgery. But at this time, you did not know when the surgery was, right?
A. I knew it was -- soon as I got insurance, I scheduled the surgery.
Q. I -- I understand that. But in -- per your testimony, in January 2024, you had not seen a neurosurgeon, so you didn't have an idea as to when your surgery would be, right?
A. An exact date, no, ma'am.
Q. How about an estimated date? Do you know?
A. I knew, yes.
Q. Okay. What -- what estimation you knew about?
A. Three months.
Q. And how did you know that you wouldn't be having surgery in three months?
A. Because I -- that's how long -- I came to the understanding that that's how long it would take for me to be covered by the insurance to where I could have a surgery like that and they'd cover it. Where -- where did I get that from, I -- I don't remember. I don't

FOR READING AND SIGNING

remember who told me.
Q. Do you know when you got insurance?
A. No, I don't recall.
Q. Do you know when you had your surgery?
A. May -- either May 1st or May 2nd. May 3rd -- May 1st, 2nd, or 3rd. One -- I can't remember.
Q. Okay. That's fine. Of 2024?
A. Yes.
Q. Okay. Do you recall when your first visit to the neurosurgeon was?
A. After that?
Q. After the surgery?
A. No. I'm asking do -- my visit to the neurosurgeon after the surgery or my first visit to the neurosurgeon, period?
Q. No, no. I'm asking your first visit ever after your hospital stay and transfer to Houston in January 3rd, 2024.
A. Oh. I'm not -- I -- I don't recall when that was.
Q. Would have been before May 2024, right?
A. Yes, it was -- it was -- it was well before then.
Q. Okay. In -- you did not go to work in January 2024, correct?

FOR READING AND SIGNING

A. No, I didn't.
Q. Were you getting paid in January 2024?
A. Yes.
Q. Did you get paid the whole month of January 2024?
A. I don't recall when I stopped getting paid.
Q. You stopped getting paid at a certain point in time, right?
A. Right.
Q. Did you stop getting paid before your surgery?
A. Yes.
Q. Do you recall if you stopped getting paid in February?
A. I don't recall. I just knew I stopped getting paid and I -- I expected that to happen at some point because I knew that my PTO would run out.
Q. Okay. Okay. You told me that there were additional times after January 2024 that you visited Helena, correct?
A. Yes.
Q. Okay. Let me pull up my notes. You stated under -- under oath that you -- there was another time per your recollection that you visited Helena in February 2024; is that correct?
A. Yes.

FOR READING AND SIGNING

Q. Do you know if this was at the beginning of February 2024, middle, or end?
A. I don't recall.
Q. Why did -- why were you at Helena -- well, strike that.
How many times do you recall visiting Helena in February 2024?
A. I -- I can't remember. It -- it wasn't many.
Q. Was it more than one?
A. Maybe.
Q. You don't know?
A. I don't know.
Q. You specifically recall at least one?
A. Yes.
Q. Okay. In the visits that you do recall, why did you go to Helena? What -- what was that visit for?
A. I -- I had stopped getting paid, and so I just went up there to, you know, ask about, you know, what -- again, what I needed to do. Just to -- just -- no, not to ask what I needed to do. That's not what happened. I went up there to check on my, you know, my job to make sure, you know, everything was good.
Q. Do you recall who you talked to at this time?
A. Yes, I only talked to Janice.
Q. Okay. And would this have been the visit that

FOR READING AND SIGNING

you told the TWC in your unemployment benefit that they told you mid February that when your PTO ran out, you would be terminated?

A. They didn't -- I was already -- when I went up there to talk to them, I was already terminated. I seen the paperwork. I -- I seen it on some -- I seen it on the other lady's desk.

Q. So in this visit in February 2024, you already know you've been terminated?

A. No. When I went up there to visit, I didn't know I was terminated until I saw that paperwork.

Q. Okay. So during that visit in February 2024, you learned you had been terminated?

A. Yes.

Q. Do you recall what lady's desk you saw this paperwork?

A. It's -- it's two people that work in HR, Janice and another lady. It was the other lady. If I recall correctly. I -- I -- I think it was two people that work in HR. I can't remember, but I think it was two people. It was on somebody's desk in HR. It might have been an empty desk.

Q. So once you see this paperwork, did you ask about your termination?

A. Yes.

FOR READING AND SIGNING

Q. Who did you ask about this?
A. Janice.
Q. You recall exactly what you asked her?
A. I asked why did it -- you know, why does it say I'm terminated?
Q. What did she say?
A. She said, we didn't know, or something like that.
Q. Okay.
A. I can't -- I can't recall what she said. She said something to the effect of, we didn't know -- like, you hadn't said anything. That -- that's what -- that's what she said, something like that. You hadn't said anything so we didn't know.
Q. Okay. I want to be clear here. Do you recall what she said or not really?
A. I told you what I recall of -- of that conversation.
Q. Okay. But you said you -- that your recollection was that you hadn't said anything or something like that?
A. No, she said -- oh, go ahead. I'm sorry.
Q. I just want to make sure. Let's start with this first question. Do you recall Ms. Janice -- what Ms. Janice responded to you specifically?

FOR READING AND SIGNING

A. She said something -- something to the likes of, we didn't know, and you hadn't said anything so we didn't know.

Q. Anything else you recall about her response this time around?

A. And then she said again, just get better and come back.

Q. But by then, February 2024, you knew you were terminated?

A. That's what I saw on the paper.

Q. At this time, did you request unemployment benefits?

A. No.

Q. At this time, did you request any governmental assistance?

A. No.

Q. At this time, how were you taking and providing for yourself?

A. I'd really rather not say. Just different things.

MS. ALFARO: Okay. Objection, nonresponsive.

Q. (BY MS. ALFARO) This -- This is part of this case, what you did or not in order to find another job or sustain yourself. So my question is, by

FOR READING AND SIGNING

February 2024, your testimony has been that you knew by the paperwork that you had been terminated and you were not earning compensation anymore from Helena. So my question was, how were you providing for yourself?

A. My mom.

Q. Did you work at all during this time?

A. No.

Q. You have some sort of music business, don't you?

A. Yes.

Q. During this time, did you work on your music business?

A. I've never stopped working on my music in 22 years.

Q. During this time, did you receive any earnings from your music?

A. I got money from my mom.

Q. You also told me that on or around -- okay. I believe, and correct me if I'm wrong, you also told me that at the beginning of May, you went to Helena, May 2024?

A. I -- I went to Helena the day before I had the surgery.

Q. And what was your purpose in going to Helena the day before your surgery?

FOR READING AND SIGNING

A. Just to let -- just to let Janice know that I was having the surgery and I'll be back.

Q. So you only visited with Janice?

A. I believe so. I -- I don't -- yes, I only visited with Janice. I didn't visit with anybody else that day.

Q. Okay. Do you recall, I know you told me the gist of what you were going to tell her. Do you recall what you told Janice specifically?

A. I just told her, you know, I was going -- I don't recall the exact words. I told her I was going to have my surgery and I'll be back when I'm well.

Q. What was her response?

A. Okay. That she wished me well.

Q. Anything else you recall about that visit to Helena that you conversed with Janice or anybody else?

A. I don't recall conversing with anybody else.

Q. How long did your visit to Helena this time around last, do you recall?

A. It maybe was two or three minutes.

Q. Okay. And then you also told me that you visited Helena at least one more time June or July, correct?

A. I had interviews.

Q. One interview or more than one?

FOR READING AND SIGNING

A. No. I had one interview -- I had -- I had testing. I had testing one day and then I had an interview another day. And I maybe was up there another time.

Q. This is after your surgery?

A. After surgery, yes.

Q. Okay. So you had your surgery on or around May 2024, correct?

A. Yes.

Q. Okay. And did the surgery go well?

A. It -- it went -- yes, they got the tumor, if that's the question.

Q. Did you receive or are receiving any type of treatment after the surgery?

A. After the surgery, yes, I'm -- yes.

Q. What treatment were you receiving?

A. I take -- I still take medicine for high blood pressure and I take medicine for seizures. And depression and anxiety.

Q. Okay. Do you know if your brain tumor was malign or was it benign, was it cancerous?

A. It wasn't cancerous.

Q. It was or wasn't?

A. Was not.

Q. Okay. So what treatment did you receive other

FOR READING AND SIGNING

than medicines after May 2024 for your brain tumor?
A. Just medicines. And I -- I had some swelling and stuff like that, and they treated me for that.
Q. And do you know when after your surgery you were completely released by the doctors, if you have been released?
A. June something. They -- when they took the staples out, June -- after they took the staples out, I had to wait for -- for the swelling to go down and then I was released.
Q. Okay.
A. But then I started having seizures.
Q. And do you know why you were having seizures. Has the doctor told you?
A. They -- they don't know. They think it's a side effect of the surgery, but they don't know for sure. They still haven't found out.
Q. And you take antiseizure medication on a daily basis?
A. Two or three of them, yes.
Q. You told me you are currently not working, correct?
A. Right.
Q. So at any point in time after you learned in February 2024 that you had been terminated from Helena,

FOR READING AND SIGNING

did you -- have you applied for any jobs anywhere?
A. I hadn't applied for any jobs until after the surgery and then I started applying for jobs.
Q. Okay. And I know you've mentioned you applied for jobs at Helena. But my question is going to be other than Helena, had -- have you applied for jobs elsewhere?
A. Yes. Warehouse jobs, different jobs.
Q. How many applications have you put in?
A. A lot. I don't know.
Q. Fair enough. Are you still placing applications, job applications?
A. No, I'm not.
Q. Why not?
A. Because I'm -- I'm -- I have a seizure disorder. So I get -- I get disability for my seizures.
Q. Okay. So when you say you get disability, you get Social Security from the disability?
A. Yes, if that's what it's called. I don't know.
Q. What --
A. It's a disability.
Q. So let's -- do you get a check from the government for your disability as income?
A. Yes.
Q. Okay. And since when do you get this check?

FOR READING AND SIGNING

A. I started getting it in January, around January. I don't know the exact date.
Q. Okay.
A. It -- it might have been December or it might have been January --
Q. Okay.
A. -- when I started getting the check.
Q. And would that be January '26 or December 2025, or would that be before?
A. '26.
Q. And how much do -- do they pay you biweekly or monthly?
A. Monthly.
Q. Do you know how much you get on a monthly basis?
A. 1444.
Q. Can you work while getting Social Security disability?
A. I can't.
Q. You cannot?
A. They -- you have to earn a certain amount, but I -- I can't because my seizures.
Q. When was the first time you were experiencing seizures, do you recall?
A. It was after the surgery. I can't recall.

FOR READING AND SIGNING

Q. Okay. So was it immediately after the surgery or some months after?

A. It wasn't immediately after the surgery. But they -- they developed. Two weeks or so, but I didn't think nothing of it.

Q. When was the first time a doctor told you you couldn't work because of the seizures?

A. I don't remember.

Q. Do you know the name of your neurosurgeon?

A. Blackburn. Dr. Blackburn.

Q. And is Dr. Blackburn in Houston or --

A. Houston.

Q. Houston. So when you see your neurosurgeon, you travel from Port Arthur to Houston?

A. Yes. I -- I don't see him anymore.

Q. Why not?

A. Because I -- I have the -- the -- the -- I have the -- I -- I get the -- I get the medicine. He was just to take out the tumor.

Q. Okay. So let me ask this another way. Currently, do you see any doctors?

A. Yes. I -- I -- okay.

Q. Who do you see, what doctors do you see?

A. Dr. Shama Quraishi. And let me see. That -- that's a -- that's a PCP, that's a primary care. And I

FOR READING AND SIGNING

see a psychologist. I'm trying to get the name. They just -- Dr. Ruvikar.
Q. Can you spell that for me, please?
A. Yes. R-A-V-I-K-U-M-A-R, Kanneganti.
Q. If you can spell that, too, that would be great.
A. Okay. K-A-N-N-E-G-A-N-T-I.
Q. Okay. And you said --
A. He's a psychiatrist.
Q. Psychiatrist, you said?
A. Yeah, he -- he's a psychiatrist.
Q. Okay. And are --
A. Correction.
Q. -- both of these doctors in Port Arthur?
A. Beaumont.
Q. Beaumont. Any other doctors that you currently see?
A. I saw doctor -- different doctors before I saw -- started seeing Dr. Quraishi.
Q. Like, different PCP doctors, you mean?
A. Yes.
Q. Okay. Do you know their names?
A. I don't. And -- and I saw a different neurosurgeon -- I mean, neurologist after the neuro -- after the surgery. I saw a neurologist in Beaumont -- I

FOR READING AND SIGNING

mean, no, in -- in Nederland.

Q. Okay. And do you know the name of your neurologist?

A. I don't know the name. And I don't know the name -- I -- I don't know the name of the doctor, but the health department would, the county, I believe.

Q. Do you have medical insurance?

A. I'm on Medicare.

Q. Since when?

A. This month or month before last. Since 7 -- since 7/1/2026.

Q. And before Medicare, were you on insurance?

A. Yes. I was -- I had Obamacare.

Q. And you had that since 2024?

A. No. I had county insurance. I had county insurance and then I got Obamacare and had the surgery and then -- then the Obamacare, then Medicare.

Q. So from the time before you got the surgery until your Medicare kicked in, you had what you referred to as Obamacare?

A. Yes.

Q. Okay.

MS. ALFARO: We've been going at it for a while. It's 3:10. How about we take a 15-minute break and come back. Is that okay?

FOR READING AND SIGNING

MR. KATAEV: Off -- off the record, I have a question when we come off.
MS. ALFARO: Sure.
(Brief recess.)
Q. (BY MS. ALFARO) Mr. McKenzie, I remind you that you're under the same oath as -- as earlier today. Okay?
A. Okay.
Q. I know -- I know we've talked about different time frames. But at any time between January 3rd, 2024 and May 2024, do you recall anybody at the company telling you to go and pick up your FMLA paperwork?
A. No, I don't.
Q. At any point in time during this same period, January 3rd, 2024 till May 2024, do you recall anybody at the company tell you to go and pick up some medical paperwork?
A. No, I don't.
Q. Do you ever recall Ms. Brittney Crosson telling you that you needed to do your FMLA during this same time period?
A. No, I don't.
Q. The fact that you don't recall, does that mean that that did not happen?
A. Yes, that -- it's to the best -- yeah, to the

FOR READING AND SIGNING

best of my knowledge, yes, that didn't happen. I don't recall that.

Q. And that's where I was -- that's what I was asking that last question. The fact that you don't recall it, does it mean it never happened or simply that it could or could not have happened?

A. I don't think it did happen.

MR. KATAEV: Objection, asked and answered, compound.

THE WITNESS: Okay.

MR. KATAEV: And just for clarity for the record, I said "objection, asked and answered, compound." And the witness responded, "I don't think it did happen."

MS. ALFARO: Noted.

Q. (BY MS. ALFARO) Do you consider Ms. Brittney Crosson your friend?

A. Yes.

Q. Do you consider Ms. Erica Ray your friend?

A. Yes.

Q. At any point in time while you were in the ambulance or at the hospital in January 2024, do you recall Ms. Erica Ray telling you to get a fax number so that they could fax you some paperwork?

A. No, I don't recall that.

FOR READING AND SIGNING

Q. During any of the visits you paid to Helena from January to May 2024, do you recall anybody telling you at any point in time to go and pick up FMLA paperwork from HR?

A. No, I don't recall that. If I would have been told that, I would have did that. I just wanted my job.

Q. And to be clear, from January 3rd, 2024 till May 2024, you did not provide Helena with any medical paperwork on your own?

A. No, I didn't.

Q. You testified that you're not able to work because of your seizure disorder, right?

A. Right.

Q. Okay. And since when were you told you're not able to work?

A. I don't recall the exact date I was told that.

Q. Do you have an estimate of -- of -- as to when you were told that?

A. No, I -- I don't.

Q. Okay. But we know it's after your surgery, correct?

A. After my surgery, yes.

Q. Okay. Would it -- do you recall when you stopped applying for jobs?

A. Probably -- okay. Even after I was told that I

FOR READING AND SIGNING

couldn't work, I applied for jobs anyway.
Q. Okay. Well, let's try to decide for when you were told or at least an estimate. Do you know, when was the last time you applied for a job?
A. I'm not sure. I don't recall.
Q. Was it in 2024?
A. No.
Q. Was it in 2025?
A. Yes.
Q. Okay. So we can agree that sometime in 2024, you stopped applying for jobs?
A. No, it was 2025.
Q. That's what I said. Sometime in 2025, you stopped applying for jobs?
A. Sometime in 2025, I believe.
Q. Okay. And you already told me that prior to stop -- you stopping applying for jobs, you had been told you couldn't work, right?
A. Yes.
Q. Okay. Did you stop applying for jobs at the first half of 2025 or the second half of 2025?
A. The second half of 2025.
Q. During the summer of 2025, were you applying for jobs?
A. Yes. I believe so.

FOR READING AND SIGNING

Q. Okay. How about Thanksgiving and Christmas 2025, were you applying for jobs?
A. I believe so.
Q. So you were applying for jobs in Thanksgiving and Christmas, that means December 24, December 25, 2025, you were still applying for jobs?
A. In 2025 in December?
Q. Uh-huh, yes.
A. To be -- to be honest, I -- I've applied for jobs recently, so I take that back. I -- I've -- I've applied for -- I've -- I've always...
Q. Sorry?
A. Just not as much, I -- just not as much, but I've applied for jobs against doctor's orders.
Q. Okay. I'm trying to get to you told me you were told by doctors because of the seizure disorder you couldn't work.
A. Right.
Q. Correct. And I'm trying to find out when that was told to you. And I understand that you told me you don't know the exact date. I don't expect you to. But I would like to reach an approximate date as to when you learned that information for the first time.
A. I -- I don't even know an -- an approximate date.

FOR READING AND SIGNING

Q. When did you start applying for -- for disability benefits?
A. I don't -- I don't remember.
Q. Was it six months before you received them or more than that?
A. More.
Q. And in order for you to apply for disability benefits, you have to have somebody say that you're not to work at least all the time you used to work, right?
A. Right.
Q. Okay. Do you know if you started requesting Social Security benefits in December of 2025?
A. That's when I got them.
Q. Okay. So at least six months prior, you would have been requesting them, right?
A. Yes.
Q. So at least during the summer of 2025, do you recall having requested disability benefits?
A. Yes, even -- I -- I get them and I still, like, certain -- I mean, I look for jobs.
Q. Do you have a letter from the government telling you that you've been granted disability benefits?
A. Yes.
Q. Okay. I'm going to request that you provide us

FOR READING AND SIGNING

a copy of that letter via your counsel.
Do you have documents establishing when you first applied for disability benefits?
A. No, I don't.
Q. How did you apply for disability benefits?
A. Online.
Q. By yourself?
A. Yes.
Q. When you applied online, did you receive a confirmation that you had applied?
A. Wait. I -- I'm not sure. I -- I know I had to -- I think a lawyer applied for the disability benefits, I believe. I'm not sure. I -- I don't know.
Q. Do you recall hiring a lawyer for the disability?
A. Yes. I don't know when I...
Q. Do you recall the name of that lawyer?
A. Underwood.
Q. Let me ask you this; sometimes it happens that you apply for disability benefits and the government denies you and --
THE REPORTER: Wait, can you repeat that? You cut out.
Q. (BY MS. ALFARO) Yeah. Repeating the question. Sometimes you apply for disability benefits and

FOR READING AND SIGNING

initially, you get denied by the government and you have to appeal or reapply. Do you know if that happened to you, Mr. McKenzie?
A. Yes.
Q. And through all of that process, you had an attorney representing you?
A. Yes.
Q. Okay. So we can agree that sometime before or during the summer of 2025, you started the Social Security or the disability benefits application process, right?
A. Yes, I believe so.
Q. Okay. Is it reasonable, then, to assume that sometime in the summer of 2025 or before, a doctor had told you that you could not -- you weren't able to work because of the seizure disorder you were experiencing?
A. Repeat the question?
Q. Sure. We've already established that you requested disability benefits before or during the summer of 2025, right?
A. Yes.
Q. So based on that information that you know, is it fair to say that sometime during the summer of 2025 or before, a doctor told you that you were not able to work because of the seizures that you were experiencing?

FOR READING AND SIGNING

A. Yes.
Q. You indicated that you applied to a couple of positions at Helena after your termination in February 2024, correct?
A. Correct.
MR. KATAEV: Form.
Q. (BY MS. ALFARO) And do you recall how many positions at Helena you've applied to?
A. Two or three.
Q. Do you know what these positions were for?
A. Warehouse, my old job back, and another one I can't remember.
Q. Were all these jobs in Texas that you applied for?
A. I believe so.
Q. Do you -- it is your testimony today that you don't believe having applied to any jobs in -- for Helena in Tennessee or elsewhere?
A. Yeah, it could have been. It could have been.
Q. Were you planning to move to Tennessee, or were you just applying to apply?
A. No, I wasn't just applying to apply.
Q. So you would have moved to Tennessee?
A. If the money would have been right.
Q. Were you qualified for all the jobs you applied

FOR READING AND SIGNING

at Helena?
A. No, not -- not the one in Tennessee, I wasn't.
Q. Okay. And this warehouse position that you applied for, was that the Tennessee one?
A. No.
Q. Okay. Were you -- do you understand that you were qualified for the warehouse position?
A. I believe I was over -- overqualified, yes.
Q. Overqualified. Did you get interviewed for that position?
A. Yes.
Q. Who interviewed you?
A. The people in the warehouse, the -- the short guy and the -- the lady there.
Q. And what happened with that position after you interview? What did they tell you?
A. I never got a call back.
Q. Okay. You also told me you applied for your old job, the production job?
A. Yes.
Q. Was that the one in Tennessee?
A. No.
Q. Who interviewed you for this position -- I'm sorry, strike that.
Were you interviewed for this position?

FOR READING AND SIGNING

A. No.
Q. Do you know what happened with this position?
A. I was told that I -- I would need to -- Erica told me that I would -- I would need to go through Kelly to get that position back but to apply for the warehouse position because it's more money.
Q. And did you understand the production job that you applied to, that was the job posted by Kelly Temporary Services?
A. I'm not sure it was posted by Kelly. I was just told by Erica.
Q. Did you apply for that job?
A. I didn't go to Kelly.
MS. ALFARO: Objection, nonresponsive.
Q. (BY MS. ALFARO) Did you ever apply to -- for that job?
A. No, not with Kelly, no.
Q. Okay. So you did apply for a warehouse position at Helena that you were interviewed for, correct?
A. Yes.
Q. And then the other one you mentioned was another job. Do you recall what that other one was?
A. I don't.
Q. Were you interviewed?

FOR READING AND SIGNING

A. No.

Q. Do you know if you were qualified or not for that job, you don't recall?

A. The one in Tennessee, I was not qualified for.

Q. Okay. So you apply to two jobs at Helena post your termination that you can recall?

A. I -- I think I applied for the old -- for my old job in production back, too, I think.

Q. Well, but you told me that that was through Kelly. And you've also testified that you did not apply or put an application for that old production job.

A. Not with Kelly, no. I think I did it online with Helena. I think. I'm not sure. I know I asked Erica about it, and Erica told me that.

Q. Okay. And you're also not sure whether that job was posted by Helena or Kelly, right?

A. I never -- I never checked to see if it was posted by Kelly. When she told me to go through Kelly and all of that stuff like that, I was like, I'm not -- okay, I'm not doing that.

Q. Okay. Other than the jobs you've applied for at Helena, what other jobs do you recall applying for?

A. Warehouse jobs at different places. I don't know the names of those places. I don't remember.

Q. Do you know, give or take, how many

FOR READING AND SIGNING

applications you've sent out?
A. I sent out a good bit, and I got interviewed -- I -- I got interviewed a -- you know, sometimes.
Q. Okay. When you say you applied a good bit, does that mean five applications?
A. No, way more.
Q. Ten?
A. I applied the same 50 or more.
Q. Okay. And of all those applications you sent out, you don't recall the name of even one?
MR. KATAEV: Objection, asked and answered.
Q. (BY MS. ALFARO) Go ahead.
A. I don't recall the name. I -- I just --
Q. Okay.
A. I don't recall the name.
Q. And then you told me you were interviewed sometimes for the warehouse positions. Do you recall the names of the companies that interviewed you?
A. No, I don't.
Q. How many interviews were you called for, more than one?
A. Yes, more than one.
Q. More than five?
A. Yes.
Q. More than ten?

FOR READING AND SIGNING

A. I'm not sure.
Q. Somewhere between five and ten?
A. Yes.
Q. Did anybody call you for an interview more than one time?
A. No.
Q. Did anybody tell you what happened with any of these positions and why you didn't get them?
A. No, I just figured it was -- I -- I have an idea.
Q. What is your idea?
A. Because of the surgeon.
Q. Okay. But that's your -- your assumption?
A. That's my assumption.
Q. In this case, you were represented by counsel and have been at least since the charge of discrimination was filed at the EEOC as -- as you have said -- as you have testified. That is correct, right?
A. Yes, to the best of my knowledge, yes.
Q. Do you recall when you hired counsel for this case for the first time?
A. No idea.
Q. Okay. You are aware that -- strike that.
Okay. You've made -- or your attorney on your behalf has made an FML claim in this case against

FOR READING AND SIGNING

Helena. I'm just looking to see in your own words, do you know specifically what regarding the FMLA is being claimed on your behalf here?

A. No. I don't know the word -- you know, I -- I wouldn't even make an attempt at it because I'm not a lawyer. I don't know the wording and, you know, the law as it -- as it applies to that and things like that. I don't know.

Q. Fair enough. Do you -- is it your position that Helena has discriminated against you in any way?

A. Yes.

Q. How?

A. By -- by not hiring me back. And -- and I feel like if I wouldn't have had the brain tumor and the surgery, then all this wouldn't be going on.

Q. You're also claiming in this lawsuit that Helena has retaliated against you. Do you know how Helena has retaliated against you?

A. Firing me.

Q. In this case -- I'm sorry. Go ahead.

A. And not hiring me back.

Q. In this case, you are asking for damages, economic and noneconomic damages. Are you aware of that?

A. Yes.

FOR READING AND SIGNING

Q. Okay. So let's talk a little bit about that. What economic damages are you claiming in this case?
A. I lost income.
Q. Anything else or would that be all?
A. Yes, just lost -- you know, I lost -- I lost income.
Q. Okay. Do you know how much income you've lost?
A. No, I don't.
Q. Okay. You received unemployment benefits, right?
A. Yes.
Q. Do you know how much you've received?
MR. KATAEV: Objection, relevance.
THE WITNESS: No, I don't know.
Q. (BY MS. ALFARO) Do you know how long you received unemployment benefits for?
A. I don't recall. Not long.
Q. More than a year?
A. Not a year.
Q. In this case, as you've testified already, you're asking for noneconomic damages as well. What are these noneconomic damages that you are requesting?
MR. KATAEV: Objection, vague.
Q. (BY MS. ALFARO) Go ahead. You can go ahead, Mr. McKenzie.

FOR READING AND SIGNING

A. Okay. Ask the question again.
Q. Sure. I'm asking you what noneconomic damages are you requesting in this case?
MR. KATAEV: Same objections.
THE WITNESS: It's like mental -- mental pain and suffering.
Q. (BY MS. ALFARO) Okay.
A. I've -- I've never been on depression medicine and stuff like that before until now.
Q. Okay. So when you say "mental pain and suffering", what specific mental pain and suffering you referring to?
A. You have a certain level of comfort when you have a job. Comfort in life because you can, you know, take care of things. And when that's snatched from you, then you don't have it. So -- and that's stressful.
And going through all that with -- on -- on top of a brain surgery, that was very stressful, a major brain surgery at that. I don't think you understand -- I keep saying a tumor. It wasn't a small one. It was a 12-hour surgery.
Q. Anything else you're referring to when you tell me mental pain and suffering, or would that be all?
A. That would be all.
Q. Okay.

FOR READING AND SIGNING

MR. KATAEV: Objection.

Q. (BY MS. ALFARO) You mentioned depression. Who diagnosed you with depression?

A. Dr. Kanneganti.

Q. When did they diagnose you with depression?

A. It was -- it was sometime after the surgery. I'm not -- I can't remember the exact date.

Q. Did depression occur because of the surgery?

A. No. It -- it occurred because of the things that happened due to the surgery, like job loss.

Q. What else happened due to the surgery?

A. That's pretty much -- I -- I mean, when -- when I lost my job, I lost different things in life.

Q. What did you lose?

A. Independence.

Q. What else? Or is that all?

A. That's the -- that's -- that encompasses it all.

Q. Okay. Let me ask you this. Aside from you losing your job, any part of your life was affected with your brain tumor, anything you can't do anymore or that is different?

A. I have seizures now, so I can't drive and things like that.

Q. What else can't you do because of the seizure?

FOR READING AND SIGNING

A. Operate heavy equipment. It's a lot of things. I mean, like, you have to give me an -- I mean...
Q. That's okay. Tell me the ones that you recall.
A. I'm really not supposed to be alone. I'm not supposed to take a bath. I'm supposed to take showers. I have tremors now.
Q. Anything else?
A. Sort of forgetful, but, you know. Yeah, still can't taste or smell.
Q. Anything else?
A. That's -- that's all that I can think of.
Q. And how regularly do you get seizures nowadays?
A. I just got out of the hospital with them. Often. It comes in spurts, let me put it like that.
Q. When were you in the hospital last time?
A. Not this Sunday, but last Sunday.
Q. Sometime between end of August, beginning of September 2026?
A. Yes.
Q. Okay. How long were you in the hospital for?
A. Four days.
Q. And what was that for? They were trying to control the seizures?
A. Yes. And -- and it was -- I had a depression episode and I -- I was having seizures, yes.

FOR READING AND SIGNING

Q. Were you at a hospital for physical conditions or a mental hospital?
A. I was at a -- a regular hospital.
Q. Since your surgery in May 2024 and this hospitalization now in 2026, have you been in the hospital more times?
A. I've been to the emergency room.
Q. How many times?
A. Not sure.
Q. More than one?
A. Yes, more than one.
Q. More than five?
A. I'm not sure.
Q. Somewhere between one and five times?
A. Yes.
Q. Okay. And why have you been at the emergency room? What has happened?
A. Seizures and blood pressure.
Q. You've already told me that your treatment for seizures is antiseizure medication. What is your treatment for blood pressure?
A. I take four blood pressure medicines. I've been taking them for years, though.
Q. Prior to your brain surgery, did you ever suffer from seizures?

FOR READING AND SIGNING

A. Never.
Q. And based on your most recent testimony, sounds like you've been suffering from high blood pressure for many years?
A. Yes.
Q. Prior to your brain surgery?
A. Yes. Probably, like, ten -- ten-plus years.
Q. Okay. Mr. McKenzie, what is your payment arrangements with your attorney? Do you know if it's contingency fee basis, do you pay him by the hour?
MR. KATAEV: Objection, relevance.
Q. (BY MS. ALFARO) Go ahead.
A. Contingency.
Q. Okay. And do you have a certain percentage that has been contracted?
A. I'm -- I'm not sure of the percentage.
Q. Okay. Do you know if it's 30 percent, do you know if it's 40 percent?
A. I'm not sure.
Q. Did you make an up-front payment to your attorney besides the contingency fee agreement?
A. No, I didn't.
MR. KATAEV: Objection, form.
Q. (BY MS. ALFARO) Okay. Mr. McKenzie, have you contacted anybody from Helena or outside to serve as

FOR READING AND SIGNING

your witness for this case?

A. No.

Q. Okay.

MS. ALFARO: Can we go off the record?

(Discussion off the record.)

Q. (BY MS. ALFARO) Thank you, Mr. McKenzie, welcome back again. I'll remind you we're under the same -- you're under the same oath as this morning.

I don't have any further questions. Anything else you would like to add, Mr. McKenzie?

A. Yes. I said those people at work, they're -- they're not -- like, they're not people who I -- they're not, like -- not, like friends that I call or anything like that, you know.

So I don't want it to be like when -- when I say that those people, that I considered them my friends, I consider everybody on Facebook my friend, you know. That -- that don't mean we hang out or, you know. They're -- they're not my friends friends, they are people that I work with.

Q. Understood.

MS. ALFARO: I have no further questions. Pass the witness.

MR. KATAEV: No questions from the Plaintiff. Thanks to the court reporter for the time

FOR READING AND SIGNING

and attention. Pursuant to Rule 30(e)(2), we're requesting a copy to read and sign.

MS. ALFARO: Thank you, Mr. McKenzie, for your time and patience today and we can go off the record.

(Deposition concluded.)

FOR READING AND SIGNING

ERRATA PAGE

WITNESS NAME: TERRY MCKENZIE, JR. DATE: 09/16/2026

PAGE LINE CHANGE REASON

FOR READING AND SIGNING

Job No. CS8435252

ACKNOWLEDGMENT OF DEPONENT

I, TERRY MCKENZIE, JR., do hereby certify that I have read the foregoing pages and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted on the attached errata page.

____________________________________________
TERRY MCKENZIE, JR.                DATE

THE STATE OF TEXAS )
)
COUNTY OF ___________)

Before me, , on this day personally appeared TERRY MCKENZIE, JR., known to me (or proved to me under oath or through (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this ____ day of , .

NOTARY PUBLIC IN AND FOR
THE STATE OF

Job No. CS8435252

FOR READING AND SIGNING

REPORTER'S CERTIFICATION
DEPOSITION OF TERRY MCKENZIE, JR.
TAKEN SEPTEMBER 16, 2026

I, Janalyn Elkins, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, TERRY MCKENZIE, JR., was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the original deposition was delivered to SONIA B. ALFARO;

That a copy of this certificate was served on all parties and/or the witness shown herein on ____________________________.

I further certify that pursuant to FRCP No. 30(f)(i) that the signature of the deponent was requested by the deponent or a party before the completion of the deposition and that the signature is to be returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons therefor.

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and

FOR READING AND SIGNING

further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 17th day of September 2026.

JANALYN ELKINS
Texas CSR 3631
Expiration Date 1/31/2027
Veritext Legal Solutions
300 Throckmorton Street, Suite 1600
Fort Worth, Texas 76102
Firm Registration No. 571
PH: (817) 336-3042

FOR READING AND SIGNING